

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| SERGIO PANTOJA, | ) |
| Plaintiff, | ) |
| v. | ) No. 02 C 8124 |
| VILLAGE OF HOFFMAN ESTATES, et al., | ) Judge Rebecca R. Pallmeyer |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff Sergio Pantoja claims that Officer Ted S. Bos and Officer Joseph Golbeck of the Hoffman Estates Police Department beat him up while they were off-duty and working as security guards at the Poplar Creek Sports Center ("PCSC" or the "Center"). The alleged beating began in the PCSC bar but continued out in the Center's parking lot, where Officer Anthony Wanic, another Hoffman Estates police officer, unleashed a police dog that proceeded to attack Pantoja.[1] Pantoja filed suit against the Village of Hoffman Estates, Officer Bos, Officer Golbeck, Officer Wanic, and PCSC, alleging that (1) the Village of Hoffman Estates and the three police officers subjected him to excessive and unreasonable force because of his race, Hispanic, in violation of 42 U.S.C. § 1983; (2) the Village of Hoffman Estates maliciously prosecuted him for battery and resisting arrest in connection with the beating; (3) all Defendants are liable for civil assault, battery, and intentional infliction of emotional distress; and (4) the Village of Hoffman Estates and PCSC negligently supervised the Defendant officers.

Pantoja settled his claims against the Village, Officer Bos, Officer Golbeck, and Officer Wanic, leaving PCSC as the sole remaining defendant in the case. PCSC now seeks summary

---

[1] It is not clear whether Officer Wanic was also working as a security guard for PCSC at the time.

judgment on Pantoja's remaining claims, arguing that it cannot be vicariously liable for the actions of Officers Bos and Golbeck. For the reasons set forth here, the motion is denied.

## BACKGROUND[2]

PCSC is a sports facility located in Hoffman Estates, Illinois. (Cmplt. ¶ 9.) Pantoja played on a soccer team organized through the Independent Soccer League ("ISL"), which rented indoor fields at PCSC on Saturday nights. (Def. 56.1 ¶ 2; Pl. 56.1 Resp. ¶ 2; Garcia Dep., at 6.)[3] Pantoja's dispute with PCSC arises from an incident involving two security guards who worked at the Center.

### A. Soccer Game Security

On September 27, 2000, Michael Crowe, the owner of PCSC, sent a letter to the ISL stating that as part of its field rental agreement, the league had to pay for three off-duty police officers to provide security at the Center during soccer games, at a cost of $20 per hour per officer. (Pl. 56.1 ¶¶ 4, 5; Letter from M. Crowe to "Saturday Night Latin League" of 9/27/00, Ex. G to Pl. 56.1.)[4] Crowe also personally informed the ISL's treasurer, Seferino Avilez, about the required security and

---

[2] Pantoja has moved to strike a number of the factual assertions in PCSC's statement of material facts as unsupported by the record. Pantoja also objects that certain statements in the affidavit of Michael W. Crowe, the owner of PCSC, contradict his deposition testimony or are "self-serving" and "conclusory." (Motion to Strike) (citing *Beckel v. Wal-Mart Associates, Inc.*, 301 F.3d 621, 622 (7th Cir. 2002)) (affidavits "offered to contradict the affiant's deposition are so lacking in credibility as to be entitled to zero weight in summary judgment proceedings unless the affiant gives a plausible explanation for the discrepancy"). To the extent the court addresses any facts in this decision, the court overrules Pantoja's objections; to the extent the challenged facts are not addressed here, the objections are moot.

[3] Defendant Poplar Creek Sports Center's Amended Motion for Summary Judgment is cited as "Def. 56.1 ¶ __." Plaintiff's Responses to Defendant's Purported Statement of Material Facts Causing No Genuine Issue is cited as "Pl. 56.1 Resp. ¶ __."

[4] Plaintiff's Additional Material Facts Supporting Denial of Summary Judgment for Defendant is cited as "Pl. 56.1 ¶ __." Though PCSC did not submit any response to this additional statement of facts, the court has conducted its own review of the underlying record citations to ensure their accuracy. *See, e.g., TIG Ins. Co. v. Giffin, Winning, Cohen & Bodewes, P.C.*, No. 00 C 2737, 2002 WL 31870528, at *5 (N.D. Ill. Dec. 20, 2002) (declining to treat defendant's failure to respond to a statement of additional facts as judicial admissions).

2

the associated cost.[5] (*Id.* ¶ 8; Avilez Dep., Ex. E to Pl. 56.1, at 10-11.) Around the same time, Crowe contacted the Hoffman Estates Police Department to arrange for the security, and Officer Wanic ultimately became, in Crowe's words, "the liaison between the police department and getting security to Poplar Creek."[6] (Crowe Dep., Ex. F to Pl. 56.1, at 23-25.)

Officer Golbeck began working as a security guard at PCSC in March 2001, having learned about the work through "word of mouth." (Golbeck Dep., Ex. L to Pl. 56.1, at 20-21.) Officer Bos claims that he worked intermittently as a security guard at PCSC for "a couple years" beginning in or around January 1999. The Secondary Employment form he submitted to the Hoffman Estates Police Department for approval of the off-duty security work, however, is dated January 10, 2001. (Ex. M to Pl. 56.1.) In any event, Officer Bos testified that he heard about the work through "guys from work," including Officer Wanic. (Bos Dep., Ex. C to Pl. 56.1, at 19-21.) Officer Bos's Secondary Employment form identified PCSC as his "Secondary Employer" and listed Crowe as the "Contact Person." (Pl. 56.1 ¶¶ 14, 15; Ex. M to Pl. 56.1.) According to Officer Bos, he named Crowe as the Contact Person because "[h]e was who was associated with the Sports Center or who you talked to if we had any questions for something." (Bos Dep., at 21.) The parties do not indicate who Officer Golbeck identified as the Secondary Employer or Contact Person on his form.

Officer Golbeck and Officer Bos never received any training from PCSC as to how to perform their security services, relying instead on their police backgrounds. (Def. 56.1 ¶¶ 14, 15; Pl. 56.1 Resp. ¶¶ 14, 15.) In addition, the officers supplied their own clothing (usually their own street clothes), as well as handcuffs, badges, and weapons, most of which had been issued by the Hoffman Estates Police Department. (*Id.* ¶¶ 16, 17; Pl. 56.1 Resp. ¶¶ 16, 17; Golbeck Dep., at 83; Bos Dep., at 37.) As for compensation, the ISL's president, Raul Garcia, testified that the league

---

[5] The parties do not indicate when Crowe spoke to Avilez about the security guards.

[6] Crowe does not recall who he spoke with at the Hoffman Estates Police Department, when he called, or how Officer Wanic came to be the liaison. (Crowe Dep., at 24.)

usually gave Crowe the money for the security guards in cash at the end of the night, but sometimes paid a PCSC "administrator" named Jorge Fuentes or the officers themselves. (Garcia Dep., Ex. D to Pl. 56.1, at 10; Pl. 56.1 ¶¶ 11, 12; Def. 56.1 ¶ 22.) Officer Bos recalls that the ISL paid the security guards directly but that, for some reason, he always received his money from one of the other security guards, whom he could not identify. (Pl. 56.1 ¶ 19; Bos Dep., at 23.) Officers Bos, Golbeck, and Wanic never received W-2 Forms or 1099 Forms relating to their work at PCSC. Officers Bos and Wanic explained that they did not report their earnings from the security work to the IRS because they never made more than $600 per year. (Def. 56.1 ¶ 13; Golbeck Dep., at 85-86; Bos Dep., at 25; Wanic Dep., at 132-33.)[7]

### B. The Alleged Beating

Pantoja participated in soccer games at PCSC for approximately eight years and was familiar with both the fields and the second-floor bar. (Def. 56.1 ¶ 5.) On December 22, 2001, Pantoja played soccer at the Center with his team until around midnight, then went up to the bar with friends after the game. (Id. ¶ 19; Pantoja Dep., at 40.) Officer Bos and Officer Golbeck were providing security in the bar at the time. (Pl. 56.1 ¶ 32.) Around 1:00 a.m., Crowe, who was also present in the bar, told Officer Bos to notify patrons that the bar was closing. Officer Bos approached Pantoja's table and told everyone that it was time to leave. (Id. ¶¶ 30, 34.) One of Pantoja's friends asked the officer if they could finish drinking a pitcher of beer they had ordered, but Officer Bos removed the pitcher from the table. (Id. ¶ 37.) When Pantoja asked Officer Bos

---

[7] Officers Bos and Wanic appear to be operating under a misunderstanding. Under the Internal Revenue Code, only the individual or corporation *making* the payments is excused from filing a Form 1099 for payments in the amount of $600 or less. *See* 26 U.S.C. § 6041(a) ("[a]ll persons engaged in a trade or business and making payment in the course of such trade or business to another person, of rent, salaries, wages, premiums, annuities, compensations, remunerations, emoluments, or other fixed or determinable gains, profits, and income . . . , of $600 or more in any taxable year, . . . shall render a true and accurate return to the Secretary, . . . setting forth the amount of such gains, profits, and income, and the name and address of the recipient of such payment"). The individuals *receiving* the payments are required to report the earnings, regardless of the amount.

4

if they could get a refund on the pitcher, Crowe responded, "You ain't getting shit. Get out of here." (Id. ¶¶ 38, 39.)

At the same time, Officer Bos told Pantoja's group to "[g]et the fuck out of here" and he grabbed Pantoja by the neck. (Id. ¶ 40.) Officer Golbeck stepped over and he and Officer Bos began kicking and punching Pantoja. They dragged him to a corner and continued hitting him while uttering profanity, and at one point hit him on the head with a cellphone. When Pantoja asked why the officers were hurting him, they responded, "Because you a big mouth, you stupid shit. Now you're getting it." (Id. ¶¶ 41-45.) Throughout the beating, Pantoja was in a fetal position trying to protect his body. His friends were unable to see what was happening in the corner because Crowe stood in front of the group and blocked their view. Fernando Perez, one of Pantoja's friends, testified that members of the group tried to help Pantoja, but that "other employees" he could not identify somehow prevented them from doing so. (Id. ¶¶ 43, 46; Perez Dep., Ex. Q to Pl. 56.1, at 17; Munoz Dep., Ex. P to Pl. 56.1, at 20-22.)

Eventually, Officer Bos and Officer Golbeck directed Pantoja out an exit door and pushed him down the stairs. (Id. ¶¶ 47, 48.) Pantoja's friends went out a different exit, but they all ended up in the PCSC parking lot. Once Officer Bos and Officer Golbeck had Pantoja in the parking lot, they pushed him to the ground and kicked and punched him some more while calling him "stupid fuck" and "motherfucker." (Id. ¶¶ 50, 51.) When it was over,[8] Pantoja's friend Juan Munoz drove him to a nearby hospital for medical treatment. Pantoja asked another friend, Cecilia Jimenez, to call the police to report the attack, but when the police arrived they arrested Pantoja.[9] (Id. ¶¶ 52, 53.)

---

[8] In his Complaint, Plaintiff alleges that Officer Wanic unleashed a police dog that proceeded to attack Pantoja in the parking lot, but neither party mentions this incident for purposes of the motion for summary judgment.

[9] The parties do not indicate what Pantoja was charged with or what happened after the arrest.

### C. Pantoja's Lawsuit

Pantoja filed suit against the Village of Hoffman Estates, Officers Bos, Golbeck, and Wanic, and PCSC, alleging violation of his civil rights under 42 U.S.C. § 1983, and state law claims for civil assault, battery, intentional infliction of emotional distress, negligent supervision, and malicious prosecution. On January 14, 2004, Pantoja settled his claims against the Village and the three officers. PCSC has moved for summary judgment on the remaining assault, battery, intentional infliction of emotional distress, and negligent supervision claims.

## DISCUSSION

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). In determining whether there is a genuine issue of fact, the court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Bennington v. Caterpillar Inc.*, 275 F.3d 654, 658 (7th Cir. 2001). The court's function in ruling on a motion for summary judgment is not to weigh the evidence, but rather to determine if there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. Where factual matters are in dispute, the court is required to credit the nonmovant's version of events. *Hostetler v. Quality Dining, Inc.*, 218 F.3d 798, 802 (7th Cir. 2000).

PCSC claims that it cannot be held vicariously liable for the actions of Officer Bos and Officer Golbeck on the night of the alleged beating because they were acting as independent contractors for the ISL. Even if the officers could be considered employees or agents of PCSC, the Center argues, they acted beyond the scope of their employment in beating Pantoja. Pantoja insists that he has raised questions of fact as to whether Officer Bos and Officer Golbeck were

acting on behalf of PCSC at the time of the beating, and whether the Center may be held responsible for the officers' tortious conduct. The court addresses each argument in turn.

A.  **Employees or Independent Contractors**

Under Illinois law, employers are vicariously liable for the tortious acts of their employees committed within the scope of employment. *Maras v. Milestone, Inc.*, 348 Ill. App. 3d 1004, 1007, 809 N.E.2d 825, 828 (2d Dist. 2004). "The employer may be liable for the 'negligent, wilful, malicious or even criminal acts of its employee[] when such acts are committed in the course of employment and in furtherance of the business of the employer.'" *Id.* at 1007-08, 809 N.E.2d at 828 (quoting *Webb by Harris v. Jewel Cos.*, 137 Ill. App. 3d 1004, 1006, 485 N.E.2d 409, 411 (1st Dist. 1985)). The hallmark of an employee or agency relationship is that the employer or principal has the right to control the manner in which the employee or agent performs his work. *Commerce Bank v. Youth Servs. of Mid-Illinois, Inc.*, 333 Ill. App. 3d 150, 153, 775 N.E.2d 297, 300 (4th Dist. 2002). On the other hand, the general rule is that "one who employs an independent contractor is not liable for the acts or omissions of the latter." *Martens v. MCL Const. Corp.*, 347 Ill. App. 3d 303, 313, 807 N.E.2d 480, 488 (1st Dist. 2004). The theory behind the general rule is that, unlike employers who monitor and direct the details of an employee's work, principals generally do not supervise the details of an independent contractor's work and, thus, are "not in a good position to prevent negligent performance." *Id.* at 313-14, 807 N.E.2d at 488.

In determining whether workers are employees/agents or independent contractors, courts consider the following factors: (1) the right to control the manner in which the work is performed; (2) the right to discharge; (3) the method of payment; (4) whether taxes are deducted from the payment; (5) the level of skill required to do the work; (6) the furnishing of the necessary tools, materials, and equipment; and (7) whether the worker's occupation is related to that of the employer. *Commerce Bank*, 333 Ill. App. 3d at 153, 775 N.E.2d at 300 (citing *Lang v. Silva*, 306

7

Ill. App. 3d 960, 972, 715 N.E.2d 708, 716 (1st Dist. 1999)); *Warren v. Williams*, 313 Ill. App. 3d 450, 456, 730 N.E.2d 512, 518 (1st Dist. 2000). Of these factors, "[t]he right to control the manner of doing the work is . . . predominant." *Commerce Bank*, 333 Ill. App. 3d at 153, 775 N.E.2d at 300. "The question of whether the parties' relationship is that of principal and agent or independent contractor is a question of fact unless the relationship is so clear that it is undisputable." *Id.*

PCSC argues that all of the relevant factors demonstrate that Officers Bos and Golbeck were working at the Center as independent contractors. PCSC first notes that the officers did not receive any training, instruction, or equipment from the Center in connection with the security guard position, and that they relied on their extensive skills as police officers to perform the work. Pantoja denies that the officers needed "*any* level of skill" to work as security guards because "no written advertisement containing qualifications for the job w[as] prepared." (Pl. Resp., at 8)[10] (emphasis in original.) He also questions whether the security guards "*had to have any* equipment" to do the job. (*Id.* at 9) (emphasis in original.) The court cannot agree that the absence of a job posting establishes that security guards do not need any special skills or equipment. To the contrary, Crowe expressly required the ISL to pay for off-duty police officers, whose skills and equipment would naturally translate to the private security context. (Letter from M. Crowe to "Saturday Night Latin League" of 9/27/00, Ex. G to Pl. 56.1.)

PCSC next points out that the officers were paid in cash at the end of the night and did not receive any W-2 or 1099 tax forms. Pantoja claims that PCSC "could have still issued 1099s to [the officers], since Crowe or another defendant employee generally gave the cash to the security guards." (Pl. Resp., at 9.) Pantoja's speculation that PCSC could have reported the payments, however, in no way refutes PCSC's showing that the officers never received 1099 Forms. (Def. 56.1 ¶ 13; Golbeck Dep., at 85-86; Bos Dep., at 25; Wanic Dep., at 132-33.) *See Morfin v. City*

---

[10] Plaintiff's Memorandum of Law in Opposition to Defendant Poplar Creek Sports Center's Motion for Summary Judgment is cited as "Pl. Resp., at ___."

*of East Chicago*, 349 F.3d 989, 1002 (7th Cir. 2003) (quoting *Ortiz v. John O. Butler Co.*, 94 F.3d 1121, 1127 (7th Cir. 1996)) ("[s]peculation is insufficient to withstand summary judgment").

There is also some dispute as to who actually handed the money to the officers at the end of the evening. Pantoja claims that "soccer league officers unequivocally testified that Crowe 'handled all of that stuff,' including . . . payment to the security guards." (Pl. Resp., at 10; Pl. 56.1 ¶ 13.) In fact, ISL President Garcia testified only that he usually gave the money to Crowe to give to the security guards, but occasionally paid the guards directly. Officer Bos claims that the "two gentlemen who ran the soccer league" (presumably Garcia and Avilez) always paid the guards directly. (Garcia Dep., Ex. D to Pl. 56.1, at 10; Pl. 56.1 ¶¶ 11, 12, 19; Def. 56.1 ¶ 22; Bos Dep., at 23.) In any event, neither party disputes that the source of the money was the ISL, and not PCSC, or that the guards received every penny of the $20 hourly fee. (*See* Letter from M. Crowe to "Saturday Night Latin League" of 9/27/00, Ex. G to Pl. 56.1) (requiring the ISL to pay for three off-duty police officers at a cost of $20 per hour per officer).

With respect to the issue of control, PCSC argues that "the police officers worked at the facility in order to keep the place safe and they were not controlled to any extent by PCSC or the soccer league as to the method in which they obtained that result." (Def. Mem., at 7.)[11] Indeed, there is no evidence that Crowe assigned officers to work in certain areas of the facility; monitored their activities throughout the evening; or gave them any instructions intended to override their professional judgment in handling security matters. *See Lang*, 306 Ill. App. 3d at 974, 715 N.E.2d at 717 (jockey was an independent contractor where his pre-race discussions with the horse owner "were designed to familiarize [the jockey] with the peculiarities and characteristics of the horse that he was going to ride and were not intended to override [the jockey's] professional judgment").

---

[11] The Memorandum of Law in Support of Poplar Creek Sports Center's Motion for Summary Judgment is cited as "Def. Mem., at __."

Pantoja finds it significant that Crowe instructed Officer Bos to notify patrons that the bar was closing on the night of the alleged beating, arguing that "[o]ne can reasonably infer that Crowe or one of defendant's employees routinely did so." (Pl. Resp., at 8.) Even assuming this is a fair inference, it in no way demonstrates that PCSC controlled the officers' security work. Pantoja presents no evidence to suggest that Crowe told the officers how to notify the patrons about the closing or how to ensure that they left the bar. Nor is there any indication that Crowe had the ability to discipline or discharge the officers if they refused to follow his directive. At most, Crowe's instruction shows that he had the authority to decide when to close the bar and to ask the security guards to help him. Pantoja claims that PCSC "trivializes its right to control over the security guards, which should not be confused with the fact of control." (*Id.*) Aside from the instruction to close the bar, however, Pantoja points to no evidence of any such right of control on the part of Crowe or PCSC.

Pantoja also disputes Crowe's statement in his affidavit that "[t]he security officers who worked on the night of the incident in this case were not officers who are regularly scheduled to work at [PCSC]." (Crowe Aff. ¶ 1.) In Pantoja's view, the fact that "neither Bos nor Golbeck testified that they were *not* scheduled to work that evening . . . presents a credibility dispute." (Pl. Resp., at 8) (emphasis added). Significantly, however, there is no evidence that anyone asked Officer Bos or Officer Golbeck questions about the regularity of their schedules. Thus, Crowe's affidavit that the officers worked on a per-evening basis stands uncontroverted.

Viewing the evidence in a light most favorable to Pantoja, the only reasonable inference is that Officers Bos and Golbeck were working as independent contractors when they allegedly beat Pantoja. The court recognizes that Officer Bos named PCSC as his "Secondary Employer" and Crowe as his "Contact Person" in requesting permission from the Hoffman Estates Police Department to perform off-duty security work. There is no evidence that Crowe or anyone else told Officer Bos to complete the form in that manner, however, or that any other officers included the

same information on their forms. Pantoja's mere speculation that Officer Golbeck may have listed PCSC as his secondary employer is insufficient to raise a genuine issue of fact as to whether the officers were employees of PCSC. *Morfin*, 349 F.3d at 1002.

At the same time, the court does not agree with PCSC that the security guards can only be deemed independent contractors for the ISL. Neither party has developed this issue beyond the arguments addressed above, but the court notes that Crowe arranged for the off-duty police officers to perform security work with the assistance of Officer Wanic. On these facts, a reasonable jury could conclude that the security guards were independent contractors for PCSC.

## B. Liability of PCSC

Having determined that questions of fact exist as to whether Officers Bos and Golbeck were independent contractors for PCSC, the court next considers whether the Center may be liable for the officers' actions in beating Pantoja. As noted, the general rule is that principals are not liable for the acts of independent contractors. *Martens*, 347 Ill. App. 3d at 313, 807 N.E.2d at 488; *Kouba v. East Joliet Bank*, 135 Ill. App. 3d 264, 267, 481 N.E.2d 325, 328 (3d Dist. 1985) ("an employer is not responsible for the physical acts of an independent contractor who also happens to possess the powers of an agent"). "Vicarious liability may[, however,] be imposed for the actions of independent contractors where an agency relationship is established under either the doctrine of apparent authority . . . or the doctrine of implied authority." *Petrovich v. Share Health Plan of Illinois, Inc.*, 188 Ill. 2d 17, 31, 719 N.E.2d 756, 765 (1999). In addition, an employer may be liable for the acts of an independent contractor if it should have known that the contractor was performing work in a dangerous manner and took no action despite "an opportunity to prevent injury by the exercise of the power of control [the employer] retained." *Barton v. Chicago and North Western Transp. Co.*, 325 Ill. App. 3d 1005, 1035 n.12, 757 N.E.2d 533, 558 n.12 (1st Dist. 2001).

11

### 1. Apparent Authority

"Apparent authority arises when the principal holds an agent out as possessing the authority to act on its behalf, and a reasonably prudent person, exercising diligence and discretion, would naturally assume the agent to have this authority in light of the principal's conduct." *Letsos v. Century 21-New West Realty*, 285 Ill. App. 3d 1056, 1065, 675 N.E.2d 217, 224 (1st Dist. 1996) (citing *Gilbert v. Sycamore Municipal Hosp.*, 156 Ill. 2d 511, 523, 622 N.E.2d 788, 795 (1993)). The doctrine "is based on the notion that if a principal creates the appearance that a party is its agent, it will not be permitted to deny the agency if an innocent third party reasonably relied on the apparent agency, and is harmed as a result." *Id.* (citing *O'Banner v. McDonald's Corp.*, 173 Ill. 2d 208, 213, 670 N.E.2d 632, 634 (1996)). To establish the existence of apparent authority, Pantoja must show: (1) PCSC consented to or knowingly acquiesced in the officers' exercise of authority; (2) based on the actions of PCSC and the officers, he reasonably concluded that the officers were agents of PCSC; and (3) he justifiably relied on the officers' apparent authority to his detriment. *Letsos*, 285 Ill. App.3d at 1065, 675 N.E.2d at 224.

PCSC's sole challenge to the apparent authority theory is that Pantoja did not reasonably rely on PCSC to ensure his safety in the bar. According to PCSC, Pantoja's "purpose for being at PCSC was to play soccer and the incident out of which his claim arises took place in a bar on the second level of the facility whereas the soccer fields are on the first level. Clearly, he was not relying on PCSC's reputation for running a safe and reputable bar during his visit there, but instead, its reputation for having an excellent soccer facility." (Def. Mem., at 9) (citing *O'Banner*, 173 Ill.2d 208, 670 N.E.2d 632.) The plaintiff in *O'Banner* slipped and fell in the bathroom of a McDonald's restaurant and sued the McDonald's Corporation for the damages he sustained. 173 Ill. 2d at 209, 670 N.E.2d at 633. McDonald's moved for summary judgment on the ground that the restaurant was owned by one of its franchisees and the corporation had no ownership interest or control over

the facility. The circuit court granted the motion but the appellate court reversed, finding genuine issues of fact as to whether the franchisee served as McDonald's apparent agent. *Id.* at 212, 670 N.E.2d at 634. On appeal from that decision, the Illinois Supreme Court again reversed, concluding that the trial court had properly granted summary judgment because the plaintiff failed to show that he actually relied on the franchisee's apparent agency in going into the restaurant. "The fact that this was a McDonald's may have been completely irrelevant to his decision. For all we know, [the plaintiff] went there simply because it provided the closest bathroom when he needed one or because some friend asked to meet him there." *Id.* at 214, 670 N.E.2d at 635.

Unlike the plaintiff in *O'Banner*, who entered the McDonald's restaurant on one occasion for unclear reasons, Pantoja had played soccer at PCSC for approximately eight years and he had also been in the bar area on numerous occasions. (Def. 56.1 ¶ 5.) Thus, it is possible that Pantoja went to PCSC on December 22, 2001 both to play soccer and to hang out with his friends in the bar. Pantoja did testify that he went to PCSC that night to "[k]eep [in] good physical condition," (Pantoja Dep., at 40), but he did not state that that was his only purpose in going to the Center. PCSC insists that it "is not a multi-million dollar corporation holding itself out as a safe place to come and drink. It is a small sports facility." (Def. Mem., at 9.) To the extent PCSC chooses to provide a bar area at the facility, however, it has an obligation to ensure the safety of its soccer patrons who go there.

PCSC next argues that "someone in Plaintiff's shoes would be well aware that the security guards are off-duty police officers that are paid by the soccer league to be present on the night of the games." (Def. Mem., at 9.) In support of this argument, PCSC first notes that the guards "wore no attire to show that they worked for PCSC." (Def. Reply, at 4.)[12] Though this does support the

---

[12] Defendant Poplar Creek Sports Center's Reply Memorandum of Law to Plaintiff's Memorandum of Law in Opposition to Motion for Summary Judgment is cited as "Def. Reply, __."

13

conclusion that the guards were independent contractors and that PCSC did not hold them out as agents, it does not speak to Pantoja's reliance. See *Enesco Corp. v. Doherty*, 314 Ill. App. 3d 123, 135, 731 N.E.2d 888, 897 (1st Dist. 2000) (workers were properly characterized as independent contractors where they, among other things, were not required to wear uniforms).

PCSC also notes that Pantoja admitted to being "involved in payment to Poplar Creek to play at their facility" in 2000. (Pantoja Dep., at 145; Def. 56.1 ¶ 3.) Pantoja explained, however, that he merely "delivered a payment to someone at defendant Poplar Creek Sports Center for the company that was sponsoring the soccer team that I played on at that time. I did not work for the company that was sponsoring the team." (Pantoja Aff. ¶ 3; Pl. 56.1 ¶ 21.) Significantly, there is no evidence that the payment had anything to do with security. Even assuming Pantoja knew that the security guards were off-duty police officers paid for by the ISL, moreover, that at most raises a question of fact as to who Pantoja was relying on for his safety: PCSC, the soccer league, or the police officers themselves.

PCSC claims that even if the officers had apparent authority to act as agents of PCSC, the alleged beating is beyond the scope of that authority. In PCSC's view, "[a] reasonable person in PCSC's shoes would only give security guards working on its premises authority to quell disturbances on the premises. Beyond that, the officers would be acting outside their scope of authority." (Def. Mem., at 10) (citing Restatement (Second) of Agency § 229.) Conduct of a servant falls within the scope of employment or agency if (1) it is of the kind he is employed to perform; (2) it occurs substantially within the authorized time and space limits; (3) it is actuated, at least in part, by a purpose to serve the master; and (4) if force is intentionally used by the servant against another, the use of force is not unexpectable by the master. (Restatement (Second) of Agency § 228; *Gaffney v. City of Chicago*, 302 Ill. App. 3d 41, 49, 706 N.E.2d 914, 919 (1st Dist. 1998). Whether conduct falls within the scope of an agent's apparent authority is generally a

question of fact. *A & B Freight Line, Inc. v. Ryan*, 216 Ill. App. 3d 1093, 1099, 576 N.E.2d 563, 568 (2d Dist. 1991).

The court is satisfied that a reasonable jury could conclude that the alleged beating fell within the officers' scope of authority. The officers were performing security services at PCSC and specifically attempting to assist Crowe in closing the bar when they beat Pantoja. In addition, there is evidence that Crowe was present when the beating began and tacitly condoned it. Specifically, when Pantoja asked about a refund on a pitcher of beer, Crowe responded, "You ain't getting shit. Get out of here." (Pl. 56.1 ¶¶ 38, 39.) The officers' intentional use of force may have been excessive, but the court cannot say that it was "unexpectable" as a matter of law. To the contrary, it is reasonably foreseeable that security guards may need to use some amount of force to perform their job, and that circumstances may escalate to the level alleged in this case. *See, e.g., Gaffney*, 302 Ill. App. 3d at 49, 706 N.E.2d at 919 ("scope of employment" encompasses "those acts which are so closely connected with what the servant is employed to do, and so fairly and reasonably incidental to it, that they may be regarded as methods, even though quite improper ones, of carrying out the objectives of the employment").

### 2. Reasonable Care

PCSC finally seeks to avoid vicarious liability by arguing that Crowe "acted responsibly in choosing professional police officers to work his bar." (Def. Mem., at 10.) Pantoja disagrees, noting that one month before his attack, a citizen made an excessive force complaint against Officer Golbeck relating to his work on the Hoffman Estates Police Department. (Pl. Resp., at 9; Pl. 56.1 ¶ 16; Golbeck Dep., at 72-74.) Golbeck testified, however, that he himself did not know about the complaint until shortly before his deposition in this case, and Pantoja has offered no basis for inferring that "[Officer] Bos also knew about it and could have informed Crowe." (Pl. Resp., at 9.) *Morfin*, 349 F.3d at 1002. Nor is the court certain that a single excessive force

15

complaint is sufficient to challenge Officer Golbeck's fitness to perform security guard work. Indeed, Pantoja does not indicate whether the complaint was ever investigated or substantiated. Pantoja claims that security guards were involved in another physical altercation with a Hispanic patron approximately one month prior to Pantoja's attack, but he points to nothing which suggests that Officer Golbeck or Officer Bos were the guards in question, or that Crowe thereafter allowed the offending officers to continue working as security guards at PCSC. (Pl. 56.1 ¶¶ 1-3.)

Nevertheless, Pantoja has presented evidence that Crowe was in the bar on the night of the alleged beating and that he deliberately stood in front of Pantoja's friends to block their view of the attack. (Pl. 56.1 ¶ 43; Munoz Dep., Ex. P to Pl. 56.1, at 20-22.) Pantoja claims that "[o]ne could . . . reasonably infer that by defendant's employees barricading Pantoja's party while the security guards beat Pantoja in the corner, defendant insinuated that it condoned physical attacks on its patrons." (Pl. Resp., at 9-10.) At a minimum, there is a question of fact as to whether Crowe knew the officers were acting in a dangerous manner and whether he retained sufficient control to prevent injury to Pantoja but chose not to intervene. *Barton*, 325 Ill. App. 3d at 1035 n.12, 757 N.E.2d at 558 n.12.

### C. Specific Claims

PCSC does not specifically address whether Pantoja has established the elements of his various claims. Pantoja similarly omits any discussion of his civil assault and battery claims, but he does argue that summary judgment is inappropriate on his claims for intentional infliction of emotional distress and negligent supervision. To the extent PCSC does not dispute Pantoja's showing on these claims other than as discussed above, the court declines to grant summary judgment.

## CONCLUSION

For the reasons stated above, PCSC's motion for summary judgment (Docket No. 56-1) is denied.

ENTER:

Dated: February 15, 2005

_____
REBECCA R. PALLMEYER
United States District Judge